## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MASON CAPITAL MASTER FUND, L.P., | ) ) ) | |
| Plaintiff, | ) ) | Civ. Action No. |
| v. | ) ) ) | COMPLAINT AND JURY DEMAND |
| WALGREENS BOOTS ALLIANCE, INC., STEFANO PESSINA, and GEORGE R. FAIRWEATHER, | ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

# **TABLE OF CONTENTS**

**PAGE**

NATURE OF THE ACTION ............................................................... 2

JURISDICTION AND VENUE ........................................................... 7

PARTIES............................................................................................ 7

    I.    Plaintiff................................................................................. 7

    II.   Defendants........................................................................... 8

    III.  Rite Aid ............................................................................... 8

FACTUAL ALLEGATIONS .............................................................. 9

    I.    The Merger.......................................................................... 9

    II.   Rite Aid's and Walgreens' Initial Attempts to Address the FTC's Concerns and Obtain Regulatory Approval................................................. 12

    III.  Defendants Mislead the Market about the Progress and Likely Outcome of the FTC's Review of the Merger ............................................. 21

    IV.  The Closing of the Merger Is Pushed Back, but Defendants Continue Misrepresenting the Progress and Likely Outcome of the FTC's Review of the Merger ....................................... 33

DEFENDANTS' FALSE AND MISLEADING STATEMENTS.......................... 40

ADDITIONAL ALLEGATIONS OF SCIENTER ................................. 52

PLAINTIFF'S ACTUAL RELIANCE ................................................. 58

PRESUMPTION OF RELIANCE....................................................... 59

LOSS CAUSATION........................................................................... 61

NO SAFE HARBOR ......................................................................... 64

FIRST CAUSE OF ACTION ............................................................. 65

**PAGE**

SECOND CAUSE OF ACTION ................................................................68

PRAYER FOR RELIEF ..........................................................................70

JURY DEMAND ...................................................................................70

Plaintiff Mason Capital Master Fund, L.P. ("Plaintiff") is an investment fund that purchased the common stock of Rite Aid Corporation ("Rite Aid").  Plaintiff, through its undersigned attorneys, by way of this Complaint and Jury Demand, brings this action against Defendant Walgreens Boots Alliance, Inc. ("Walgreens") and certain of its executive officers, Stefano Pessina ("Pessina") and George R. Fairweather ("Fairweather" and, together with Walgreens and Pessina, "Defendants"), and allege the following upon personal information as to itself and its own acts, and upon information and belief as to other matters.

Plaintiff's information and belief is based on, *inter alia*, an investigation by its attorneys, which includes, among other things, a review and analysis of:  Rite Aid's and Walgreens' public filings with the United States Securities and Exchange Commission ("SEC"); Rite Aid's and Walgreens' press releases and public statements; Walgreens' earnings call transcripts and transcripts of presentations, media, and analyst reports concerning Rite Aid and Walgreens; documents publicly filed in *Hering v. Rite Aid Corporation*, No. 1:15-cv-2440 (M.D. Pa.) and *Chabot v. Walgreens Boots Alliance, Inc.*, No. 1:18-cv-2118 (M.D. Pa.) (collectively, the "Class Action"); and other publicly available documents concerning Rite Aid and Walgreens.

Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control.  Plaintiff

believes that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is an action to recover significant investment losses suffered as a result of numerous false and misleading statements made by Walgreens and its senior executives concerning Walgreens' unsuccessful attempt to acquire Rite Aid.

2.      On October 27, 2015, Walgreens announced that it had successfully negotiated a deal to acquire Rite Aid for $9 per share, which amounted to a total price of approximately $17.2 billion.   The merger was originally scheduled to close during the second half of 2016.

3.      Because the merger involved two of the three largest retail drug stores in the United States and would have left only two companies in control of more than 75% of the market share, it was subject to and conditioned upon receiving the approval of the Federal Trade Commission ("FTC") and the Antitrust Division of the United States Department of Justice ("DOJ").   After the merger agreement was inked, both Rite Aid and Walgreens publicly expressed confidence that they would be able to obtain antitrust approval for the merger.

4.      As parties to the merger, Rite Aid and Walgreens had access to nonpublic information about the progress of the FTC's approval process.   Indeed, the two companies worked closely with the FTC throughout its twenty-month

review, providing the FTC with extensive information, documentary material, and supporting data.

5.      Beginning around April 2016, the FTC identified certain geographic areas where the merger would create antitrust issues.  In response, Rite Aid and Walgreens attempted to alleviate the FTC's antitrust concerns by preparing a plan to divest certain stores in those areas.  This was easier said than done.  Internally, Walgreens struggled to find a purchaser for the stores that needed to be divested, and it failed to obtain FTC approval of a divestiture plan.  Publicly, however, Defendants assured investors that the merger was "progressing as planned."

6.      As 2016 drew to a close with no apparent closing of the merger in sight, journalists began to question whether the merger would be completed on time, if at all.  On October 18, 2016, for example, the *New York Post* reported that Walgreens and Rite Aid were having trouble divesting the stores they needed to divest in order to obtain regulatory approval.   The next day, October 19, 2016, *Business Insider* published an article with the headline:   "*The $17 billion Walgreens-Rite Aid deal looks like it's in trouble.*"   The article stated that "[t]raders have lost faith in Walgreens' giant deal to buy Rite Aid," and noted that, according to Bloomberg, the FTC was likely to find the proposed divestiture plan to be insufficient.

7.      Rather than provide honest assessments of the status of the FTC review and the likelihood of receiving regulatory approval, Walgreens' most senior

executives misled the investing public.  Although Defendants knew that the parties still needed to make "substantial progress" with potential purchasers of stores before they could even determine the "best path forward" with the FTC, they publicly expressed a high level of confidence about the merger obtaining timely regulatory approval.

8.     Perhaps even more egregiously, Defendants denied the truth of the negative press reports even though Defendants had inside knowledge of the FTC's review that actually supported those reports.  Defendants tried to discredit the articles not only by claiming that they were inaccurate, but also by belittling the status of the reporters who penned the articles.  For example, on November 8, 2016, Walgreens' Executive Vice Chairman and Chief Executive Officer ("CEO"), Defendant Pessina, presented at the Credit Suisse Healthcare Conference and cast the following aspersions on the journalists who reported negatively about Walgreens' efforts to obtain regulatory approval for the merger:

> [E]verybody we have seen today and in the last days is asking about Rite Aid and about *we have a different opinion than certain journalists who are writing things we don't recognize or people we -- or about people we have never heard of*.  So just to reassure you, *if we say that we are confident, it is because what we know makes us very confident*.[1]

---

[1] Unless otherwise indicated, bold and italic emphasis used in quotations throughout this Complaint has been added and did not appear in the original quotation.

9.     On December 20, 2016, Walgreens and Rite Aid announced that they had entered into an agreement to sell 864 Rite Aid stores to Fred's, Inc. ("Fred's") for $950 million. Significantly, however, the companies did not have assurances from the FTC that this divestiture would resolve the antitrust concerns that the FTC privately had identified to Walgreens and Rite Aid.

10.     On January 30, 2017, Walgreens and Rite Aid announced that they were entering into an amended merger agreement that reduced the merger price, required the divestiture of more stores than was previously disclosed, and postponed the closing date of the merger by six months, purportedly "to allow the parties additional time to obtain regulatory approval." Specifically, under the amended agreement, the merger consideration was reduced from $9 per share to between $6.50 and $7 per share, the parties were required to divest up to 1,200 Rite Aid stores, and the closing date was pushed back from January 27, 2017, to July 31, 2017.

11.     However, even after announcing this significant amendment to the original terms of the merger, Defendants still did not come clean about the progress or likely outcome of the FTC's review. Instead, they doubled down on their prior misrepresentations. Defendants continued telling investors that, based on their inside knowledge, they were confident that the merger would receive regulatory approval.

12.     Those representations turned out to be false, and on June 29, 2017, the companies announced that they were terminating the merger because they were unable to obtain regulatory approval from the FTC.  The divestiture agreement with Fred's was also terminated.

13.     Defendants' securities fraud caused tremendous damage to investors. As information about the progress and likely outcome of the FTC's review of the merger slowly leaked into the market, the price of Rite Aid common stock plummeted nearly 33%, from $3.53 per share to $2.36 per share.

14.     Plaintiff is an investment fund that purchased a significant amount of Rite Aid common stock during the time when Defendants, unbeknownst to the investing public, were making materially false and misleading statements concerning the progress and likely outcome of the FTC's review of the merger.  As a series of partial but inadequate disclosures about the progress and likely outcome of the FTC's review of the merger were released to the market and the previously concealed risks about the merger partially materialized, investors suffered significant losses.

15.     Plaintiff therefore brings this action under the federal securities laws to recover the investment losses suffered as a result of Defendants' materially false and misleading misstatements.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

17.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

18.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391.  Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District.

19.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange and market.

## PARTIES

I.     **Plaintiff**

20.     Plaintiff Mason Capital Master Fund, L.P. is a Cayman Islands exempted limited partnership whose investment adviser has its main office in New York, New York.  The dates on which Plaintiff purchased Rite Aid common stock during the relevant period are attached hereto as Exhibit A.

21.     At all relevant times, Mason Capital Management, LLC ("Mason") provided investment advisory services to Plaintiff in connection with its purchase of Rite Aid common stock.

## II.     **Defendants**

22.     Defendant Walgreens is a Delaware corporation with its principal place of business located at 108 Wilmot Road, Deerfield, Illinois 60015.   Walgreens' common stock is publicly traded in the United States on the NASDAQ Stock Market under the ticker symbol "WBA."   Walgreens is the largest retail pharmacy, health, and daily living destination in the United States and Europe, and is a global leader in retail and wholesale pharmacy.   Walgreens services millions of customers each day at its retail locations, on its digital platforms, and through its portfolio of brands, including Duane Reade, Boots and Alliance Healthcare, No7, and Soap & Glory.

23.     Defendant Pessina is Walgreens' Executive Vice Chairman and CEO and served in those roles throughout the relevant period.

24.     Defendant Fairweather was Walgreens' Executive Vice President and Global Chief Financial Officer ("CFO") during the relevant period.   Fairweather was replaced as Global CFO on June 1, 2018.

## III.     **Rite Aid**

25.     Rite Aid is a Delaware corporation with its principal place of business located at 30 Hunter Lane, Camp Hill, Pennsylvania 17011.   Rite Aid's common

stock is publicly traded in the United States on the New York Stock Exchange under the ticker symbol "RAD."  Rite Aid provides an array of health care services and retail products to over a million Americans each day through its 2,400 retail pharmacy locations.  Rite Aid also provides pharmacy benefits and services to over four million members worldwide.

## FACTUAL ALLEGATIONS

### I.    The Merger

26.    On October 27, 2015, Rite Aid and Walgreens issued a joint press release announcing that they had "entered into a definitive agreement under which [Walgreens] will acquire all outstanding shares of Rite Aid . . . for $9.00 per share in cash, for a total enterprise value of approximately $17.2 billion, including acquired net debt" (the "Merger").  Rite Aid and Walgreens touted the Merger as creating "a further opportunity to deliver a high-quality retail pharmacy choice for U.S. consumers in an evolving and increasingly personalized healthcare environment" and stated that the transaction was "expected to close in the second half of calendar 2016."

27.    Prior to the Merger, Rite Aid, Walgreens, and CVS Health Corporation ("CVS") were the three largest retail drug store chains in the United States.  Rite Aid operated approximately 4,570 stores across 31 states and the District of Columbia, while Walgreens operated approximately 8,183 stores across all 50 states, the

District of Columbia, Puerto Rico, and the United States Virgin Islands. Rite Aid and Walgreens each operated hundreds of stores in California, New York, and Ohio.

28.     Once combined, Rite Aid and Walgreens would dwarf CVS – both in terms of revenue and number of stores – and leave only two companies in control of more than 75% of the United States market share.

29.     Unsurprisingly, the market was immediately focused on the issue of whether the Merger would obtain regulatory approval.   In an article titled "*Walgreens, Rite Aid Unite to Create Drugstore Giant*," the Wall Street Journal predicted that "[t]he deal, which would unite two of the country's three biggest drugstore owners, would be likely to draw scrutiny from antitrust regulators, who could demand divestitures in exchange for their approval."

30.     Two days later, on October 29, 2015, Rite Aid released a script and set of frequently asked questions and talking points to provide its employees with information regarding the Merger.   The script stated, among other things, that "[b]oth Rite Aid and [Walgreens] have had extensive consultation with anti-trust counsel, and based upon the complementary nature of the market profiles of both companies, and the amount of pharmacy counters in the U.S., we do not believe the combination should cause regulatory concern.   Nonetheless, under the terms of the merger agreement, [Walgreens] can divest some stores if needed to obtain FTC approval."   The set of frequently asked questions and talking points contained

similar statements regarding the low level of regulatory risk posed by the Merger and the possibility that Walgreens would divest some stores if necessary to obtain approval from the FTC.

31.     That same day, Rite Aid filed the Agreement and Plan of Merger dated as of October 27, 2015 (the "Merger Agreement") with the SEC.  The Merger Agreement provided that if the Merger was not consummated by October 27, 2016, (the "End Date"), subject to extension until January 27, 2017, both Rite Aid and Walgreens had a mutual termination right.  The Merger Agreement also revealed that Walgreens had agreed to divest up to 1,000 stores if necessary to obtain regulatory approval.

32.     However, over the next few weeks, Defendants downplayed the figure in the Merger Agreement and told investors that Walgreens would likely need to divest less than 500 stores to obtain regulatory approval.  For example, at the Credit Suisse Healthcare Conference on November 10, 2015, Walgreens' Co-Chief Operating Officer, Alexander Gourlay ("Gourlay"), told investors that "we've said publicly . . . 1,000 stores may have to be divested . . . we believe that it's probably about ½ [half] that number."  Defendant Fairweather made a similar statement at the Morgan Stanley Global Consumer and Retail Conference on November 17, 2015. Defendant Fairweather told investors that "[w]e're anticipating the store divestitures

will be less than 500, although [the Merger Agreement] provides for up to 1,000, but we don't anticipate that will be the case."

## II.   Rite Aid's and Walgreens' Initial Attempts to Address the FTC's Concerns and Obtain Regulatory Approval

33.   On November 10, 2015, Rite Aid and Walgreens each filed a "Notification and Report Form for Certain Mergers and Acquisitions" with the FTC and DOJ, as required by the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act").

34.   The primary purpose of the HSR Act is to provide antitrust enforcement agencies with the opportunity to review mergers and acquisitions – and their potential anticompetitive effect – before such mergers and acquisitions are consummated.  To do so, the HSR Act requires companies to submit a Notification and Report Form for Certain Mergers and Acquisitions and then wait a specified period of time, generally thirty days, before consummating the merger or acquisition. If, during the waiting period, the DOJ or FTC determines that further inquiry is necessary, the agencies may make a second request for additional information or documentary material from the companies.

35.   If the DOJ or FTC determines that the merger or acquisition is likely to create an anticompetitive effect, they will discuss with the parties acceptable remedies to maintain or restore competition in the markets affected by the merger or acquisition.   The most common and accepted remedy is the divestiture of an

-12-

autonomous, on-going business unit that comprises at least one party's entire business in the relevant market. A divestiture is designed to immediately eliminate the competitive problems caused by the merger or acquisition by preserving or re-creating the competitive status quo and also entails the least amount of risk. Once the parties have agreed on the specifics of the divestiture, they must propose to the DOJ or FTC an acceptable buyer. The buyer must have the financial capability and incentive to operate the assets and also the competitive ability to maintain or restore competition in the market. If both the divestiture and the buyer are acceptable, the investigative staff for the FTC or DOJ will send a recommendation memorandum, along with the parties' underlying consent agreement, to the FTC or DOJ for its review and approval.

36.    If the FTC or DOJ approves the consent agreement, the parties may consummate the merger or acquisition. If the negotiations are unsuccessful or one of the agencies rejects the consent agreement, they may seek an injunction prohibiting consummation of the merger or acquisition or challenge it via administrative litigation.

37.    On December 10, 2015, Rite Aid and Walgreens issued a joint press release announcing that, "as expected," they had each received a request for additional information and documentary material from the FTC (the "Second

Request").  The joint press release downplayed the Second Request as a "standard part of the regulatory process in connection with the FTC's review" of the Merger.

38.     The Second Request extended the HSR Act's waiting period – which was scheduled to expire at 11:59 p.m. that night – until 30 days after Rite Aid and Walgreens "substantially complied" with the request for additional information. However, in the joint press release, Rite Aid and Walgreens emphasized that they "have been cooperating with the FTC staff since shortly after the announcement of the proposed acquisition" and that they still expected the Merger to close in the second half of 2016.

39.     According to the preliminary proxy statement filed by Rite Aid on Form 14-A with the SEC on March 3, 2017 (the "Proxy"), in late 2015, Rite Aid's antitrust counsel, Jones Day, and Walgreens' antitrust counsel, Weil, Gotshal & Manges LLP ("Weil"), began working with the FTC in an effort to resolve the FTC's questions and concerns about the Merger.  Over the next few months, Jones Day and Weil had "extensive discussions" with the FTC about "the merits of the transaction, the proposed synergies and potential remedies, including the potential divestiture of retail stores."  In addition, Rite Aid and Walgreens "provided additional data and documents in response to various requests from the FTC[,]" including the Second Request, "and volumes of data related thereto."  As detailed in the Proxy, Jones Day and Weil provided regular updates to Rite Aid's and Walgreens' management

regarding the materials and information provided to the FTC and the FTC's response.

40.     On January 7, 2016, Walgreens held an earnings call to discuss its financial results for the first quarter of 2016.  During the earnings call, Defendant Pessina assured investors that the Merger was "progressing as we expected and planned" and that Walgreens "continue[d] to anticipate completing the transaction in the second half of calendar year 2016."  As in the December 10, 2015 joint press release, Defendant Pessina downplayed the Second Request and told investors that it was a "standard part of the regulatory process in connection with the FTC's review."  Indeed, Defendant Pessina informed investors that Walgreens had already formed an integration team that was "well underway on preliminary planning work."

41.     Later on in the earnings call, an analyst asked:  "[g]iven that you guys have gotten your second request, I guess, anything in the conversations thus far that would indicate whether you guys have any changes on store divestiture expectations . . . are you guys still thinking the number's less than 500?"  Defendant Pessina responded that Walgreens "do[esn't] have any reason to change our view.  As I have said before, we are working with relevant authorities in order to speed up the process if possible, of course. . . . We are still confident that these will go through in the terms that we have anticipated."

42.     A few weeks later at Walgreens' 2016 Annual Stockholders Meeting, Defendant Pessina repeated that Walgreens and Rite Aid were "currently going through the regulatory process to get approval" for the Merger and that, "[s]o far, this process is proceeding as we had anticipated, and we continue to expect the transaction to complete at some point in the second half of this calendar year."

43.     Several months later, on April 5, 2016, Walgreens held an earnings call to discuss its financial results for the second quarter of 2016.  During the earnings call, Defendant Pessina told investors that the Merger was "continuing as we expect with the regulatory approval process progressing in line with the timetable we had expected."  Later during the call, an analyst noted that the divestitures were "top of mind for investors" and asked whether "anything changed in the competitive landscape since you announced the deal that could impact potential divestitures?" Defendant Pessina assured the analyst that "[n]o.  Nothing has changed except for the fact that we are collaborating . . . we knew from the very beginning that this would have been a very long process and that we would have been asked for many, many documents and information.  We are going through the process.  The process is developing in an absolute[ly] normal way. . . . it's nothing atypical exactly on line with what we were expecting."

44.     According to the Proxy, around late April 2016, the FTC began identifying certain geographic areas of interest that could suffer anticompetitive

effects as a result of the Merger and would therefore need to be remediated before the Merger could obtain regulatory approval. Thus, as explained in the Proxy, between May and August 2016, Rite Aid and Walgreens retained economists who drafted and submitted to the FTC more than 20 advocacy papers and econometric analyses addressing the Merger's anticompetitive effect in the FTC's geographic areas of interest.

45.    As also explained in the Proxy, "[o]ver the course of the next several months, Rite Aid, [Walgreens], Jones Day and Weil continued to respond to the FTC Staff and [Walgreens] and Weil worked to establish a divestiture process that they believed would potentially satisfy the FTC Staff's questions about the transaction and discussed the divestiture process with Jones Day. . . . Weil developed a divestiture framework that could be presented for approval by the FTC and discussed the divestiture framework with Jones Day." At the same time, Walgreens' financial advisor, Bank of America Merrill Lynch ("BAML"), began contacting potential buyers for some or all of the divestiture assets. "Over the next several months, [Walgreens] and Rite Aid entered into confidentiality agreements with eighteen (18) potential purchasers of divestiture assets."

46.    On July 6, 2016, Walgreens held an earnings call to discuss its financial results for the third quarter of 2016. Although Rite Aid and Walgreens and their counsel had just – nine months into the FTC's review – started developing a

divestiture plan and contacting potential purchasers, Defendant Pessina assured investors that the Merger was "progressing as planned.  As you know, we are in the process of seeking regulatory approval.   In parallel, our integration team is continuing its work on preliminary planning."   In response to a question from an analyst about the timing of the Merger and the number of stores Walgreens expected to divest, Defendant Pessina represented:  "[w]e still believe that our initial estimate is correct.  We still believe that at the end, we will stay in the range of the stores that we initially indicated, around 500.  And time-wise, we still believe that we will be able to . . . finish the deal by the end of this financial -- or calendar year, as we said. So by December, we believe everything will be done."

47.    According to the Proxy, on September 8, 2016, with only two months left until the Merger Agreement's End Date, BAML provided the 18 potential purchasers with access to a virtual data room containing due diligence information about the divestiture assets being offered.  Following the receipt of bids a few weeks later, Walgreens decided to pursue further negotiations with three potential purchasers, including Fred's, Inc.  As explained in the Proxy, Walgreens' selection of the three potential purchasers was based in large part on the "likelihood that each potential purchaser would be deemed an acceptable purchaser of the divestiture assets by the FTC" and Jones Day's and Weil's belief that "the FTC would be more

inclined to approve one buyer that would purchase all of the divestiture assets rather than multiple buyers that would purchase a portion of the divestiture assets."

48.    Also on September 8, 2016, Walgreens issued a press release announcing that the companies "remain actively engaged with the Federal Trade Commission (FTC) regarding its review of the pending acquisition.  As a result of the progress of these discussions with the FTC staff, [Walgreens] is exploring potential divestiture remedies to address certain issues raised in those discussions." Walgreens also announced, for the first time, that it "now expects that the most likely outcome will be that the parties will be required to divest more than the 500 stores previously communicated, but still continues to expect that fewer than 1,000 stores will be required to be divested."  Although there was only a month-and-a-half until the Merger Agreement's End Date, Walgreens stated in the press release that it "continues to believe the acquisition will close in the second half of calendar 2016."

49.    As detailed in the Proxy, in October and early November 2016, Rite Aid and Walgreens "had extensive due diligence meetings" with each of the three potential purchasers.  After "extensive negotiations with each of the three potential purchasers[,]" Walgreens decided to "focus its efforts on one divestiture buyer that [Walgreens] would select to bring to the FTC for approval first while it continued to negotiate with other bidders."

50.     According to the Proxy, on October 18, 2016, Walgreens provided Rite Aid with an update on the divestiture process.  With only nine days left until the Merger Agreement's October 27, 2016 initial End Date, Walgreens informed Rite Aid that "[n]o divestiture transaction had been entered into yet, and [Walgreens] believed the parties still needed to make substantial progress with multiple potential buyers in order to determine the best path forward."  Walgreens also informed Rite Aid that it intended to extend the Merger Agreement's End Date until January 27, 2017, and hoped that Rite Aid would agree to the extension so that the parties could announce it jointly.

51.     Also according to the Proxy, that same day, Jones Day informed Rite Aid that "the FTC's review continued, and to the extent the FTC would approve any proposed plan, in Jones Day's judgment this could not occur by the October 27 end date."  Rite Aid therefore "determined that the extension of the end date was advisable and in the best interest of Rite Aid and its stockholders, in order to provide additional time to obtain FTC approval and close the transaction."

52.     With the Merger Agreement's End Date rapidly approaching, the market began to wonder whether the FTC's review of the Merger really was "progressing as planned" as Defendants had repeatedly represented.  On October 18, 2016, for example, the *New York Post* reported that the Kroeger Company – Walgreens' "best hope" for a divestiture – was "feared to be close to passing on

acquiring some of the 650 stores that Walgreens would have to sell to gain regulatory approval . . . ."

53.     The next day, October 19, 2016, *Business Insider* published an article titled "*The $17 billion Walgreens-Rite Aid deal looks like it's in trouble*."  The article stated that "[t]raders have lost faith in Walgreens' giant deal to buy Rite Aid" and noted that, according to Bloomberg, the FTC was likely to find the proposed divestiture package to be insufficient.

## III.  Defendants Mislead the Market about the Progress and Likely Outcome of the FTC's Review of the Merger

54.     On October 20, 2016, Walgreens and Rite Aid issued a joint press release announcing that they had mutually agreed to extend the Merger Agreement's End Date from October 27, 2016, to January 27, 2017.  In light of the extension, "[t]he companies now expect the transaction will close in early calendar year 2017."

55.     Also on October 20, 2016, Walgreens filed its 2016 annual report with the SEC on Form 10-K (the "2016 10-K").  In the press release accompanying the 2016 10-K, Walgreens stated – notwithstanding that Rite Aid and Walgreens had just been forced to extend the Merger Agreement's End Date by three months – that the Merger is "progressing as planned" and that it "remains actively engaged with the Federal Trade Commission (FTC) regarding its review of the pending acquisition, and continues to expect that the most likely outcome will be that the parties will be required to divest between 500 and 1,000 stores.  The Company

believes that it will be able to execute agreements to divest these stores to potential buyers, pending FTC approval, by the end of calendar year 2016, and now expects its Rite Aid acquisition will close in early calendar 2017."

56.   Defendant Fairweather provided investors with a similar update during Walgreens' earnings call later that day (the "2016 10-K Earnings Call").  During the 2016 10-K Earnings Call, an analyst pointed out that "divesting the Rite Aid Stores has been taking longer than expected" and asked Defendant Pessina what made him confident that the Merger would close in early 2017.

57.   Despite the fact that Rite Aid and Walgreens had not yet entered into a divestiture agreement and still needed to make "substantial progress with multiple potential buyers" before even being able to determine the best path forward with the FTC, Defendant Pessina stridently responded:

> Rite Aid, yes, I agree with you that it is taking more than we expected.  ***But I have to tell you that as you have seen from our presentation and from the fact that we have included some part of our Rite Aid potential profit in our guidance, from this, you can really understand that we are confident, as confident as we were before, about this deal.  Nothing has changed.***  We have just a delay in the conclusion of the deal.  This is our perception, we have always been optimistic because we have never seen an attitude from the FTC which was absolutely negative.  Of course, they were inquiring, they were very detailed, they were asking a lot of questions.  Sometimes, they were taking time to respond.  But at the end of the day, I believe we have had a good collaboration.  We are having a good collaboration.  We try to respond to all of their needs.  This takes time.  ***But at the end, we are still confident.***  Of

course, *I know that we read on the papers very different news. No idea about the sources of these news. But for sure, if we could talk, and of course, you know that we cannot, our news would be different.* For what we see today, we see just a long administrative process, *but we don't see substantial differences from work that we were expecting. Yes, probably more stores, a little more stores here and there. But at the end of the day, I -- as far as I can see today, as far as we can see today, we are absolutely confident that we can create -- that we can do the deal and we can create the value. Just this value will be a little postponed on time* because if and when we will do the deal, of course, for the first months, we will not be able to start immediately the synergies. It will take some time. And we were hoping to do the deal at the beginning of this fiscal year. For us, in this case, we would have had time to develop some of the synergies. Of course, if we close the deal relatively late in our fiscal year, the synergies will be small, but we will find all of them next year.

58.     Following Rite Aid's and Walgreens' joint press release on October 20, 2016, the New York Post published another article titled "*The FTC is struggling to get Walgreens and Rite Aid to merge*." As per "sources close to the situation," the FTC was requesting that Walgreens divest 650 stores but "it wants only buyers that fit stringent requirements." According to the article, thus far, Walgreens had "failed to find any appropriate buyers . . . ."

59.     On November 8, 2016, Walgreens presented at the Credit Suisse Healthcare Conference. During the presentation, Defendant Pessina dismissed the recent articles questioning whether the FTC would timely approve the Merger, stating:

[E]verybody we have seen today and in the last days is asking about Rite Aid and about we have a different opinion than certain journalists who are writing things we don't recognize or people we -- or about people we have never heard of.  So just to reassure you, if we say that we are confident, it is because what we know makes us very confident.  I don't believe that there is any technical reason why this deal should not go through.   Of course, everything is possible politically, but until now we have seen a careful, diligent but absolutely not hostile attitude of the FTC, and we are collaborating.  We are presenting our buyers, and I believe that so far, so good.  And we continue to be very positive in spite of the opinion of certain people, who apparently are not particularly well informed.

60.    Gourlay made a similar statement to investors at the Morgan Stanley Consumer Conference on November 15, 2016.  In response to a question about whether Walgreens had any further updates on the Merger, Gourlay stated:

No, the process continues.  It's -- the process has never stopped. It's a process that clearly has taken longer than we had anticipated, we're having to sell potentially a few more pharmacies than we anticipated.  We have buyers. I want to say, we have buyers, not a buyer, we have buyers. We believe these buyers -- we believe strongly these buyers meet the criteria of the SEC have laid down, and the process continues.  And we've given updates saying that we expect to give more information on a deal in the early part of next year, and we stick by that.  So we don't recognize what's written in the press, to be honest.  We don't recognize the names or the people talking about it, so we don't know where that's being said.  We remain, as we did from day one, confident this is a good strategic deal for us.  The Rite Aid board clearly believes it's a good deal for them, and we believe we'll get it done.

61.     Just two days later, on November 17, 2016, Walgreens gave another presentation at the Jefferies Healthcare Conference in London (the "Jefferies Healthcare Conference Presentation").  During the presentation, an analyst inquired about the Merger, asking:  "[W]hat else do you need to do? What other creative ways do you have – I mean is there anything you can do to meet the government's requirements? . . . [H]ow should we think about your mindset where that deal is today and what steps are you taking in case the government blocks that deal?  How should we be thinking about your reaction in that unlikely scenario?"

62.     Just like on the 2016 10-K Earnings Call, Defendants – citing their inside knowledge of the FTC's review – expressed a high level of confidence about the Merger obtaining regulatory approval and discredited any articles to the contrary. Defendants did so despite the fact that, with only two-and-a-half months left until the Merger Agreement's revised End Date, Walgreens had still not selected a potential purchaser or even presented a divestiture agreement to the FTC for its review and approval – necessary prerequisites to obtaining regulatory approval of the Merger.  Specifically, Defendant Fairweather told investors that:

> ***We are very clear -- from what we said in September, we
> expect the deal to complete.***  We have been absolutely
> consistent on that from day one when we announced it.  As
> we said back in September and reinforced in our results,
> we do expect the store divestitures to now be in the range
> of 500 to 1000.

We expect to be able to sign the divestiture agreements before the end of this calendar year and to be able to complete the transaction in the first quarter, so it is -- sorry, early in the new year, in the calendar year.

So other than really from where we are a year ago, it is a few more divestitures than we had originally anticipated but within what we had in the contract, and it has just taken us a little bit longer than -- ideally we would have hoped to work through with the FTC when we work in a very collaborative manner (inaudible).

But, fundamentally, the economics of the deal are the same. We still expect to be able to deliver the $1 billion of tangible, measurable cost synergies in a 3- to 4-year period. The benefits are from the front end; all these other things, *nothing really has changed other than it's just perhaps taken a little bit longer than we had thought in the first place. There's lots of stuff in the papers but it is amazing where it comes from.*

63.     Walgreens' Senior Vice President of Investor Relations, Gerald Gradwell ("Gradwell"), added:

But I think -- *just to be clear on where we are in the process and we have spoken about this -- I mean we have enough clarity on what we have to do in terms of remedies with the FTC to be -- to have opened the data room for sale of pharmacies to potential buyers.*

Everyone I know -- there was large speculation in the marketplace that we would never find buyers. We are not entirely that green when it comes to doing transactions. We went into this in the knowledge that the Walgreens management team had looked at Rite Aid in many different ways and had not been able to justify the deal for a variety of reasons.

And so we went into it having assessed initially that we would be able to find buyers and that those interested in the marketplace to buy stores we may have to divest. That

remains the case.  We have been in ongoing discussion with the FTC.

The FTC have given permission for a number of potential buyers to access the data room.  That is at their grant because, to be very clear, there is a level of detail on the Rite Aid stores that while we have done some extensive research ourselves, Rite Aid can't share that level of data with us for commercial reasons in case the deal doesn't go through.

So the FTC have had to give -- grant permission for the potential buyers to look at the data room.  And what we said at the results was that we saw no reason, or no technical reason, why we shouldn't be able to complete our discussions with potential buyers before the end of this calendar year and that remains the same.

We have to then -- that paperwork has to go through the FTC.  The buyers have to prepare detailed business models showing that they have plans to operate those stores at least as commercially as Rite Aid did; so not as commercially as Walgreens may seek to, but at least as commercially as Rite Aid did.

And they have to provide certain other [valid entry] information to the FTC and we are working with the buyers to make sure that they are in a position to do all of that.

So from our point of view, the process has never stopped, which is quite key, because if there was a blocking rationale the case team would stop working at the FTC. You can never guarantee anything. It still has to go through the commissioners of the FTC but we are slightly further behind where we thought we would be just because the level of detail, but things are progressing well.

64.     According to the Proxy, over the next several months – and now a full

year into the FTC's review of the Merger – Jones Day and Weil "attempted" to

answer the FTC's questions regarding the three potential purchasers for the

divestiture assets. Each of the potential purchasers met with the FTC in early November 2016 to discuss their "suitability as a potential purchaser of the divestiture assets" and their "plans to transition to full operation of the divestiture assets from Rite Aid." Because Jones Day and Weil advised Rite Aid and Walgreens, respectively, that the FTC would be more likely to approve one buyer that would purchase all of the divestiture assets rather than multiple buyers that would purchase a portion of the divestiture assets, Walgreens decided to focus its efforts on negotiations with Fred's. Walgreens believed that Fred's had the willingness and ability to purchase all of the divestiture assets and would be deemed an acceptable purchaser by the FTC.

65. Walgreens continued to negotiate with Fred's throughout November and December 2016, and, on December 20, 2016, Rite Aid and Walgreens issued a joint press release announcing that they had "entered into an agreement to sell 864 Rite Aid stores and certain assets related to store operations to Fred's, Inc. . . . for $950 million in an all-cash transaction." According to the press release, the "agreement is being entered into to respond to concerns identified by the FTC in its review of the proposed [Merger] . . . [Walgreens] is actively engaged in discussions with the FTC regarding the transaction and is working towards a close of the Rite Aid acquisition in early calendar 2017." As stated by Defendant Pessina, "[w]ith

this agreement, we are moving ahead with important work necessary to obtain approval of our acquisition of Rite Aid."

66.    As the Proxy makes clear, however, Rite Aid and Walgreens still had not presented the divestiture agreement to the FTC for its review and approval, which Walgreens planned to do in the next week.

67.    Because it was becoming increasingly unlikely that the Merger would obtain regulatory approval by the January 27, 2017 End Date, the Proxy reveals that Rite Aid began privately discussing its future as a stand-alone company.  Although no decisions were made, the Proxy states that Rite Aid "planned to continue to discuss and consider these issues at later board meetings once Rite Aid received additional clarity on the likelihood of completing the merger before the January 27, 2017, end date."

68.    According to the Proxy, during December 2016 and January 2017, the FTC analyzed and reviewed the proposed divestiture agreement with Fred's, requested "substantial" documents from Rite Aid and Walgreens relating to the divestiture, and served subpoenas on members of Fred's management.

69.    On January 5, 2017, Walgreens filed its quarterly report for the first quarter of 2017 with the SEC on Form 10-Q (the "1Q2017 10-Q").  In the press release accompanying the 1Q2017 10-Q, Defendant Pessina stated:  "we continue to

work toward closing the pending acquisition of Rite Aid Corporation in the early part of the calendar year."

70.   On the earnings call later that day (the "1Q2017 Earnings Call"), Defendant Fairweather told investors that – despite the rapidly approaching January 27, 2017 End Date – Walgreens "continued to make good progress towards completing our Rite Aid transaction" and "we're actively engaged in discussions with the FTC and are still working towards the close of the acquisition in the early part of this calendar year, having announced the Fred's agreement on the 20th of December 2016."

71.   Defendant Pessina went on to explain:

> In terms of corporate development, you have seen the progress we announced at the end of December regarding the proposed transaction with Rite Aid and having reached a conditional agreement with Fred's.  We still have to complete our work with the FTC.  And as we have seen, these things can take some time, as the FTC are scrupulous in ensuring that they consider every things properly and fully.  *That said, I remain as convinced as ever of the strategic benefit of the proposed Rite Aid transaction* and look forward to being able to provide you with another update as soon as we can.
>
> We are clearly making progress.  And while I would always like to move faster and do more, we must be measured and ensure we work at a pace with which *we are confident we can deliver for our customers and our shareholders on all the plans and the strategies we have discussed with you.*  Our confidence is only strengthened by our recent performance.  Holiday shopping started later than usual, with the bulk of the sales occurring the last

days before Christmas.  That said, we have once again
seen what appears to be a solid holiday period in our main
retail market.

72.    Defendant Pessina was then asked by an analyst "what's the kind of

plan B if it doesn't get approved as we get down to the end here kind of in the U.S.

business?"  Defendant Pessina responded:

> We are working hard to have this deal approved.  And for
> the time being, we don't want even to think of the fact that
> the deal could not be approved after so many months when
> we have given a lot of information and ***we have had a very
> good relationship with the people of the FTC.***  And they
> have continued to ask information and we have continued
> to give information.  And in reality, we believe that, if they
> have spent so much time asking so -- and analyzing so
> many documents, that it's because they want to understand
> the substance of this transaction, which is fine.  ***So we are
> not thinking of a plan B today.***  We don't have to distract
> people today.  I can assure you if -- that if I -- let's say we
> had a big surprise that this couldn't happen after, we would
> have to sit down and decide what to do because there are
> many, many possible reaction to this, as you can imagine.
> We would have to see what our counterparty, Rite Aid,
> wants to do and see whether there are solutions or not,
> what are the other alternatives.  In reality, we will have
> money and then we will use the money in the best interest
> of our shareholders.  We will continue to act rationally.
> We will not spend the money in an irrational way just for
> the matter of principle.  We will analyze all the
> opportunities very quickly, because I and really more team
> of people here are thinking as a ways of different scenery,
> analyzing many other things.  Then I think we will decide
> what to do and we will communicate to the shareholders
> what we want to do, but I can assure you that we will not
> have a, let's say, how could I say, an hysterical reaction.
> And we will not feel forced to do something at any cost
> just we show that we are doing something.  We will take

> stock of the money that we have and we will analyze very
> calmly and very rationally which is the best use of this
> money at that time for our shareholder.

73.    Defendant Pessina made these representations to investors despite the

fact that, with less than three weeks left until the Merger Agreement's End Date,

Defendants had only recently entered into the divestiture agreement with Fred's and

submitted it to the FTC for its review and approval.  The FTC was therefore still in

the midst of analyzing the proposed divestiture agreement, requesting "substantial"

documents from Rite Aid and Walgreens related to the Merger, and serving

subpoenas on members of Fred's management.

74.    According to the Proxy, the very next day, January 6, 2017, Rite Aid,

Jones Day, and Weil, among others, met to discuss the "increasing likelihood that

the merger would not be consummated by the January 27, 2017 end date."

Notwithstanding the fact that Defendant Pessina had just told investors, *the day

before*, that he was confident in the Merger and that there was no "Plan B," Jones

Day informed Rite Aid that, in its opinion, "the FTC would not recommend approval

of the divestiture transaction by the end date."

75.    Given the status of the FTC's now fifteen-month review, the Proxy

reveals that Rite Aid and Walgreens met several times in January 2017 to discuss

the "FTC review process and ways in which the parties might propose to revise

certain aspects of Fred's business plan and propose potential changes to the asset

purchase agreement to address the questions raised by the FTC Staff in their review of Fred's and to increase the likelihood of obtaining FTC approval of the transaction."  The Proxy states that Rite Aid and Walgreens also "held preliminary discussions about the possibility of extending the end date beyond January 27, 2017. No specific terms were discussed, and Rite Aid and [Walgreens] agreed to meet on January 22, 2017 to discuss the potential extension further."

## IV.   The Closing of the Merger Is Pushed Back, but Defendants Continue Misrepresenting the Progress and Likely Outcome of the FTC's Review of the Merger

76.    In January 2017, Rite Aid and Walgreens began discussing an amendment of the Merger Agreement.

77.    According to the Proxy, between January 23, 2017, and January 29, 2017, Rite Aid, Walgreens, Jones Day, and Weil, and the parties' other counsel met daily to discuss, among other things, "the possibility of amending the [Merger Agreement] to extend the end date, to alter the divestiture obligations in the [Merger Agreement], [or] to propose potential changes to the divestiture transaction with Fred's."   Rite Aid and Walgreens exchanged several proposals and counter-proposals amending the Merger Agreement's End Date, the Merger price, and other terms of the Merger Agreement.  Each proposal was geared towards maximizing the chance of obtaining FTC approval of the Merger, including by providing for the divestiture of an increased number of stores.

78.    Ultimately, on January 29, 2017, Rite Aid and Walgreens entered into Amendment No. 1 to the Merger Agreement (the "Amended Merger Agreement").

79.    The next day, January 30, 2017, Rite Aid and Walgreens issued a joint press release announcing that they had entered into the Amended Merger Agreement and "agreed to reduce the price for each share of Rite Aid common stock to be paid by [Walgreens].  The revised price will be a maximum of $7.00 per share and a minimum of $6.50 per share.  In addition, [Walgreens] will be required to divest up to 1,200 Rite Aid stores and certain additional related assets if required to obtain regulatory approval.  The exact price per share will be determined based on the number of required store divestitures, with the price set at $7.00 per share if 1,000 stores or fewer are required for divestiture and at $6.50 per share if 1,200 stores are required for divestiture.  If the required divestitures fall between 1,000 and 1,200 stores, then there will be a pro-rata adjustment of the price per share."  Rite Aid and Walgreens also announced that they had agreed to extend the Merger Agreement's End Date from January 27, 2017, to July 31, 2017, "in order to allow the parties additional time to obtain regulatory approval."

80.    On January 31, 2017, Rite Aid released a new set of talking points and questions and answers to provide its employees with information about the Amended Merger Agreement.  The questions and answers made clear that Rite Aid and Walgreens had agreed to divest additional stores and extend the Merger Agreement's

-34-

End Date until July 31, 2017, in order to obtain regulatory approval from the FTC. Rite Aid stated that "we believe the divestiture of stores and other assets to Fred's will provide the FTC with an acceptable remedy and we are diligently working with the FTC to answer their questions and address any concerns" and that the "transaction is expected to close by the end of July 2017."

81.    As was later revealed in a May 8, 2017 joint press release, in January 2017, Rite Aid and Walgreens entered into a timing agreement with the FTC whereby Rite Aid and Walgreens agreed not to consummate the Merger until at least 60 days after they both certified substantial compliance with the Second Request – which had still not happened.

82.    However, Defendants continued to express confidence in the ultimate consummation of the Merger.  On April 5, 2017, Walgreens filed its quarterly report for the second quarter of 2017 with the SEC on Form 10-Q (the "2Q2017 10-Q"). In the press release accompanying the 2Q2017 10-Q, Walgreens told investors that it "continues to be actively engaged in discussions with the Federal Trade Commission (FTC) regarding the pending acquisition, and the extension of the end date of the agreement to 31 July 2017 allows the parties additional time to obtain regulatory approval."  The press release also announced that, on April 3, 2017, Walgreens had authorized "a share repurchase program for up to $1 billion of the company's shares prior to the program's expiration on 31 December 2017."

83.   On the earnings call later that day (the "2Q2017 Earnings Call"), Defendant Fairweather represented to investors that Walgreens "continued to work hard to secure regulatory clearance for the Rite Aid transaction . . . ."   Defendant Pessina added that Walgreens was "returning an element of value of the shareholders through our new share buyback program without undermining our intention to [profitably] deleverage the company *following the closing of the proposed Rite Aid acquisition.*"

84.   Defendant Pessina went on to once again express his confidence that the Merger would obtain regulatory approval, stating:

> Turning to Rite Aid.  I am still optimistic that we will bring this deal to a successful conclusion.  But there is no doubt that the process of getting clearance for the transaction is taking longer than we expected.  We are constantly and currently collaborating with FTC, Rite Aid and Fred's to get the necessary approvals and close the transaction.  At the same time, we are working to be in a position to certify compliance.  We believe that we can achieve this in the coming weeks and are still working toward our revised time table to obtain a clearance by the end of July.  *The changes to the deal that we agreed in January demonstrate our absolute commitment to ensure all transactions meet our demanding financial and strategic requirements while allowing us the ability to address any reasonable demand that may be made of us in obtaining regulatory approval.*

85.   An analyst then asked Defendant Pessina about "where exactly aren't you and the FTC seeing eye to eye?"  The analyst continued, "And then I'm curious, do you think the deal can get approved given the current configuration of the FTC?

-36-

Or does there need to be more commissioners added in order to gain approval?"

Defendant Pessina responded:

> Well, as I said*, I am still positive on this deal. I believe that we have a strong argument for -- to defend this deal.* I cannot comment on the organization of the FTC. It will be up to them to decide whether they have enough people or not to judge on the quality of this deal. We are doing what we can with – together with Rite Aid and Fred's. *We are collaborating very well with the FTC. And as I said, we are preparing our facts to be ready to certify compliance, if we will decide to do so.*

86.     About a month later, on May 8, 2017, Rite Aid and Walgreens issued a joint press release announcing that they had finally "certified substantial compliance with the Request for Additional Information (the 'Second Request') from the United States Federal Trade Commission (FTC) regarding their merger agreement under which [Walgreens] proposes to acquire all outstanding shares of Rite Aid." Now, pursuant to Rite Aid's and Walgreens' timing agreement with the FTC, the parties had to wait at least 60 days before consummating the Merger. During that time, the FTC was still free to reject the Merger and seek an injunction or other form of administrative relief to block it.

87.     However, contrary to Defendants' public statements, on June 9, 2017, various news outlets, including Bloomberg, Reuters, and the Financial Times reported that the FTC was leaning towards denying the Merger and preparing to recommend that a lawsuit be filed to block it. Rite Aid's stock dropped *15%* on this

news, from a closing price of $3.53 per share on June 8, 2017, to a closing price of $3.00 per share on June 9, 2017.

88.     Yet there was no termination of the Merger Agreement in the ensuing days following the June 9 news.  That is, until June 29, 2017, when Rite Aid and Walgreens each separately announced that they had agreed to terminate the Amended Merger Agreement and had instead entered into an asset purchase agreement pursuant to which Walgreens agreed to purchase 1,932 of Rite Aid's stores, three distribution centers, related inventory, and other assets and liabilities related thereto for $4.375 billion (the "Asset Purchase Agreement").  According to Rite Aid's press release, "[t]he decision to terminate the merger agreement follows feedback received from the Federal Trade Commission ('FTC') that led the company to believe that the parties would not have obtained FTC clearance to consummate the merger."  The parties further announced that the divestiture agreement with Fred's would also be terminated and that Walgreens would pay Rite Aid a $325 million fee in connection with the termination of the Amended Merger Agreement.

89.     This news, which directly contradicted what Defendants had been telling investors for months, shocked the market.  Rite Aid's stock plummeted *nearly 27%* on this news, from a closing price of $3.93 per share on June 28, 2017, to a closing price of $2.89 per share on June 29, 2017.

90.    During Walgreens' earnings call later that day (the "3Q2017 Earnings Call"), Defendant Pessina told investors that, in entering into the Asset Purchase Agreement, Rite Aid and Walgreens "endeavored to address all of the substantive regulatory points raised about the original transaction" and that Walgreens believed that "this will enable us to complete the transaction in a timely manner and drive forward with our plans to further grow our company."  In response to a question from an analyst, Walgreens' Executive Vice President, Global Chief Administrative Officer, and General Counsel, Marco Patrick Anthony Pagni, reiterated that investors "should assume that we have taken account of specific feedback from the [FTC] that we have received over the last 22-odd months in formulating the store package that [we] have agreed with Rite Aid. . . . Obviously, the matter is before the [FTC], but I can tell you that we have designed it in a way, which has been very carefully thought through with Rite Aid and with our counsel to take account of all of the feedback that we received during the last 22 months in a very detailed, very detailed, review process."

91.    The fallout from Rite Aid's and Walgreens' termination of the Amended Merger Agreement and execution of the Asset Purchase Agreement continued over the next few days.  On July 3, 2017, Forbes published a lengthy article detailing the history of the Merger and speculating as to what was next for Rite Aid and Walgreens.  Various news outlets, including Chain Drug Review and

the Motley Fool, also reported that, contrary to Defendants' assurances on the 3Q2017 Earnings Call, obtaining regulatory approval of the Asset Purchase Agreement was not a sure thing.  Chain Drug Review, for example, stated that the Walgreens-Rite Aid "merger remains a work in progress, with increasing indications that it will not happen."

92.    Rite Aid's stock dropped nearly 9% on this news, from a closing price of $2.95 per share on June 30, 2017, to a closing price of $2.69 per share on July 3, 2017.  Rite Aid's stock continued to fall on July 5, 2017, and July 6, 2017, from this news, from a closing price of $2.69 per share on July 3, 2017, to a closing price of $2.36.  Overall, the continued fallout from Rite Aid and Walgreens' termination of the Amended Merger Agreement and news about the Asset Purchase Agreement potentially not obtaining regulatory approval caused Rite Aid stock to drop *20%* between July 3, 2017, and July 6, 2017.

93.    Plaintiff suffered significant losses in connection with the June 9, 2017, June 29, 2017, and July 3, 2017 partial disclosures and as a result of Defendants' materially false and misleading statements, and liquidated its position in Rite Aid common stock following the partial disclosures.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

94.    On October 20, 2016, Walgreens and Rite Aid issued a joint press release announcing that they had mutually agreed to extend the Merger Agreement's

End Date from October 27, 2016, to January 27, 2017.  In light of the extension,

"[t]he companies now expect the transaction will close in early calendar year 2017."

On the 2016 10-K Earnings Call that day, an analyst pointed out that "divesting the

Rite Aid Stores has been taking longer than expected" and asked Defendant Pessina

what made him confident that the Merger would close in early 2017.

95.    Defendant Pessina responded:

> Rite Aid, yes, I agree with you that it is taking more than
> we expected.  ***But I have to tell you that as you have seen***
> ***from our presentation and from the fact that we have***
> ***included some part of our Rite Aid potential profit in our***
> ***guidance, from this, you can really understand that we***
> ***are confident, as confident as we were before, about this***
> ***deal.  Nothing has changed.***  We have just a delay in the
> conclusion of the deal.  This is our perception, we have
> always been optimistic because we have never seen an
> attitude from the FTC which was absolutely negative.  Of
> course, they were inquiring, they were very detailed, they
> were asking a lot of questions.  Sometimes, they were
> taking time to respond.  But at the end of the day, I believe
> we have had a good collaboration.  We are having a good
> collaboration.  We try to respond to all of their needs.  This
> takes time.  ***But at the end, we are still confident.***  Of
> course, ***I know that we read on the papers very different***
> ***news.  No idea about the sources of these news.  But for***
> ***sure, if we could talk, and of course, you know that we***
> ***cannot, our news would be different.***  For what we see
> today, we see just a long administrative process, ***but we***
> ***don't see substantial differences from work that we were***
> ***expecting.  Yes, probably more stores, a little more stores***
> ***here and there.  But at the end of the day, I -- as far as I***
> ***can see today, as far as we can see today, we are***
> ***absolutely confident that we can create -- that we can do***
> ***the deal and we can create the value.  Just this value will***
> ***be a little postponed on time*** because if and when we will

do the deal, of course, for the first months, we will not be able to start immediately the synergies.  It will take some time.  And we were hoping to do the deal at the beginning of this fiscal year.  For us, in this case, we would have had time to develop some of the synergies.  Of course, if we close the deal relatively late in our fiscal year, the synergies will be small, but we will find all of them next year.

96.     As the Court has already found in denying Defendants' motion to dismiss in the Class Action, Defendant Pessina's statements, which caused Rite Aid common stock to trade at artificially inflated prices, were materially false and misleading and could have misled a reasonable investor into thinking that the review process with the FTC was progressing better than it was.  It was misleading for Defendant Pessina to express the same high level of confidence about the Merger obtaining regulatory approval and to dismiss news articles to the contrary based on his inside knowledge of the FTC's review.  Among other things:  (i) Rite Aid and Walgreens had already agreed to extend the Merger Agreement's End Date from October 27, 2016, to January 27, 2017, "in order to provide additional time to obtain FTC approval and close the transaction"; (ii) the FTC told Rite Aid and Walgreens that there were certain geographic areas of interest that could suffer anticompetitive effects as a result of the Merger; and (iii) Rite Aid and Walgreens had not yet even presented a divestiture transaction to the FTC for its review and "still needed to make substantial progress with multiple potential buyers in order to determine the best path forward."  Defendant Pessina's statements were therefore materially false and

misleading and, as the Court found in denying Defendants' motion to dismiss in the Class Action "[a]t a time when approval of the transaction may have been legitimately in doubt, the Walgreens Defendants' statements alluded to secret knowledge that created a false sense of security."

97.    On November 17, 2016, Walgreens gave the Jefferies Healthcare Conference Presentation.   During the presentation, an analyst inquired about the Merger, asking Defendant Fairweather: "[W]hat else do you need to do? What other creative ways do you have – I mean is there anything you can do to meet the government's requirements? . . . [H]ow should we think about your mindset where that deal is today and what steps are you taking in case the government blocks that deal?  How should we be thinking about your reaction in that unlikely scenario?"

98.    Defendant Fairweather responded:

> ***We are very clear -- from what we said in September, we expect the deal to complete.***  We have been absolutely consistent on that from day one when we announced it.  As we said back in September and reinforced in our results, we do expect the store divestitures to now be in the range of 500 to 1000.
>
> We expect to be able to sign the divestiture agreements before the end of this calendar year and to be able to complete the transaction in the first quarter, so it is -- sorry, early in the new year, in the calendar year.
>
> So other than really from where we are a year ago, it is a few more divestitures than we had originally anticipated but within what we had in the contract, and it has just taken us a little bit longer than -- ideally we would have hoped

to work through with the FTC when we work in a very collaborative manner (inaudible).

But, fundamentally, the economics of the deal are the same. We still expect to be able to deliver the $1 billion of tangible, measurable cost synergies in a 3- to 4-year period. The benefits are from the front end; all these other things, *nothing really has changed other than it's just perhaps taken a little bit longer than we had thought in the first place. There's lots of stuff in the papers but it is amazing where it comes from.*

99.    Gradwell added:

But I think -- *just to be clear on where we are in the process and we have spoken about this -- I mean we have enough clarity on what we have to do in terms of remedies with the FTC to be -- to have opened the data room for sale of pharmacies to potential buyers.*

Everyone I know -- there was large speculation in the marketplace that we would never find buyers. We are not entirely that green when it comes to doing transactions. We went into this in the knowledge that the Walgreens management team had looked at Rite Aid in many different ways and had not been able to justify the deal for a variety of reasons.

And so we went into it having assessed initially that we would be able to find buyers and that those interested in the marketplace to buy stores we may have to divest. That remains the case. We have been in ongoing discussion with the FTC.

The FTC have given permission for a number of potential buyers to access the data room. That is at their grant because, to be very clear, there is a level of detail on the Rite Aid stores that while we have done some extensive research ourselves, Rite Aid can't share that level of data with us for commercial reasons in case the deal doesn't go through.

So the FTC have had to give -- grant permission for the potential buyers to look at the data room. And what we

said at the results was that we saw no reason, or no technical reason, why we shouldn't be able to complete our discussions with potential buyers before the end of this calendar year and that remains the same.

We have to then -- that paperwork has to go through the FTC. The buyers have to prepare detailed business models showing that they have plans to operate those stores at least as commercially as Rite Aid did; so not as commercially as Walgreens may seek to, but at least as commercially as Rite Aid did.

And they have to provide certain other [valid entry] information to the FTC and we are working with the buyers to make sure that they are in a position to do all of that.

So from our point of view, the process has never stopped, which is quite key, because if there was a blocking rationale the case team would stop working at the FTC. You can never guarantee anything. It still has to go through the commissioners of the FTC but we are slightly further behind where we thought we would be just because the level of detail, but things are progressing well.

100.   As the Court has already found in denying Defendants' motion to dismiss in the Class Action, Defendant Fairweather's and Gradwell's statements, which caused Rite Aid common stock to trade at artificially inflated prices, were materially false and misleading and could have misled a reasonable investor into thinking that the review process with the FTC was progressing better than it was. It was misleading for Defendant Fairweather and Gradwell to express the same high level of confidence about the Merger obtaining regulatory approval and to dismiss news articles to the contrary based on their inside knowledge of the FTC's review. Among other things: (i) Rite Aid and Walgreens had already agreed to extend the

Merger Agreement's End Date from October 27, 2016, to January 27, 2017, "in order to provide additional time to obtain FTC approval and close the transaction"; (ii) the FTC told Rite Aid and Walgreens that there were certain geographic areas of interest that could suffer anti-competitive effects as a result of the Merger; and (iii) Rite Aid and Walgreens had not yet even presented a divestiture transaction to the FTC for its review and "still needed to make substantial progress with multiple potential buyers in order to determine the best path forward."  Defendant Fairweather's and Gradwell's statements were therefore materially false and misleading and, as the Court found in denying Defendants' motion to dismiss in the Class Action "[a]t a time when approval of the transaction may have been legitimately in doubt, the Walgreens Defendants' statements alluded to secret knowledge that created a false sense of security."

101.   On January 5, 2017, Walgreens filed the 1Q2017 10-Q.  On the 1Q2017 Earnings Call later that day, Defendant Fairweather told investors that Walgreens "continued to make good progress towards completing our Rite Aid transaction" and "we're actively engaged in discussions with the FTC and are still working towards the close of the acquisition in the early part of this calendar year, having announced the Fred's agreement on the 20th of December 2016."

102.   Defendant Pessina went on to explain:

> In terms of corporate development, you have seen the
> progress we announced at the end of December regarding

the proposed transaction with Rite Aid and having reached a conditional agreement with Fred's.  We still have to complete our work with the FTC.  And as we have seen, these things can take some time, as the FTC are scrupulous in ensuring that they consider every things properly and fully.  ***That said, I remain as convinced as ever of the strategic benefit of the proposed Rite Aid transaction*** and look forward to being able to provide you with another update as soon as we can.

We are clearly making progress.  And while I would always like to move faster and do more, we must be measured and ensure we work at a pace with which ***we are confident we can deliver for our customers and our shareholders on all the plans and the strategies we have discussed with you.***  Our confidence is only strengthened by our recent performance.  Holiday shopping started later than usual, with the bulk of the sales occurring the last days before Christmas.  That said, we have once again seen what appears to be a solid holiday period in our main retail market.

103.   Defendant Pessina was then asked by an analyst "what's the kind of plan B if it doesn't get approved as we get down to the end here kind of in the U.S. business?"  Defendant Pessina responded:

We are working hard to have this deal approved.  And for the time being, we don't want even to think of the fact that the deal could not be approved after so many months when we have given a lot of information and ***we have had a very good relationship with the people of the FTC***.  And they have continued to ask information and we have continued to give information.  And in reality, we believe that, if they have spent so much time asking so -- and analyzing so many documents, that it's because they want to understand the substance of this transaction, which is fine.  ***So we are not thinking of a plan B today.***  We don't have to distract people today.  I can assure you if -- that if I -- let's say we had a big surprise that this couldn't happen after, we would

have to sit down and decide what to do because there are many, many possible reaction to this, as you can imagine. We would have to see what our counterparty, Rite Aid, wants to do and see whether there are solutions or not, what are the other alternatives.  In reality, we will have money and then we will use the money in the best interest of our shareholders.  We will continue to act rationally. We will not spend the money in an irrational way just for the matter of principle.  We will analyze all the opportunities very quickly, because I and really more team of people here are thinking as a ways of different scenery, analyzing many other things.  Then I think we will decide what to do and we will communicate to the shareholders what we want to do, but I can assure you that we will not have a, let's say, how could I say, an hysterical reaction. And we will not feel forced to do something at any cost just we show that we are doing something.  We will take stock of the money that we have and we will analyze very calmly and very rationally which is the best use of this money at that time for our shareholder.

104.   As the Court has already found in denying Defendants' motion to dismiss in the Class Action, Defendant Pessina's statements, which caused Rite Aid common stock to trade at artificially inflated prices, were materially false and misleading and could have misled a reasonable investor into thinking that the review process with the FTC was progressing better than it was.  It was misleading for Defendant Pessina to express the same high level of confidence about the Merger obtaining regulatory approval based on his inside knowledge of the FTC's review. Among other things:  (i) Rite Aid and Walgreens had already agreed to extend the Merger Agreement's End Date from October 27, 2016, to January 27, 2017, "in order to provide additional time to obtain FTC approval and close the transaction"; (ii) the

FTC told Rite Aid and Walgreens that there were certain geographic areas of interest that could suffer anti-competitive effects as a result of the Merger; (iii) Rite Aid and Walgreens had only recently presented the divestiture agreement with Fred's to the FTC for its review and approval; (iv) with only a few weeks until the January 27, 2017 End Date, the FTC had requested "substantial documents" from Rite Aid and Walgreens related to the divestiture and served subpoenas on members of Fred's management; and (v) the very next day, Jones Day informed Rite Aid that "the FTC continued to review the transaction and, in [its] judgment, the FTC would not recommend approval of the divestiture transaction by the [January 27, 2017] end date."    Defendant Pessina's statements were therefore materially false and misleading and, as the Court found in denying Defendants' motion to dismiss in the Class Action "[a]t a time when approval of the transaction may have been legitimately in doubt, the Walgreens Defendants' statements alluded to secret knowledge that created a false sense of security."

105.   On April 5, 2017, Walgreens filed the 2Q2017 10-Q.  On the 2Q2017 Earnings Call later that day, Defendant Fairweather told investors that Walgreens "continued to work hard to secure regulatory clearance for the Rite Aid transaction . . . ."  Defendant Pessina added that Walgreens was "returning an element of value of the shareholders through our new share buyback program without undermining

our intention to [profitably] deleverage the company *following the closing of the proposed Rite Aid acquisition.*"

106.   Defendant Pessina went on to state:

> Turning to Rite Aid.  I am still optimistic that we will bring this deal to a successful conclusion.  But there is no doubt that the process of getting clearance for the transaction is taking longer than we expected.  We are constantly and currently collaborating with FTC, Rite Aid and Fred's to get the necessary approvals and close the transaction.  At the same time, we are working to be in a position to certify compliance.  We believe that we can achieve this in the coming weeks and are still working toward our revised time table to obtain a clearance by the end of July.  *The changes to the deal that we agreed in January demonstrate our absolute commitment to ensure all transactions meet our demanding financial and strategic requirements while allowing us the ability to address any reasonable demand that may be made of us in obtaining regulatory approval.*

107.   An analyst then asked Defendant Pessina "where exactly aren't you and the FTC seeing eye to eye?  And then I'm curious, do you think the deal can get approved given the current configuration of the FTC?  Or does there need to be more commissioners added in order to gain approval?"  Defendant Pessina responded:

> Well, as I said*, I am still positive on this deal. I believe that we have a strong argument for -- to defend this deal.* I cannot comment on the organization of the FTC. It will be up to them to decide whether they have enough people or not to judge on the quality of this deal. We are doing what we can with – together with Rite Aid and Fred's. *We are collaborating very well with the FTC. And as I said, we are preparing our facts to be ready to certify compliance, if we will decide to do so.*

-50-

108.   As the Court has already found in denying Defendants' motion to dismiss in the Class Action, Defendant Pessina's statements, which caused Rite Aid common stock to trade at artificially inflated prices, were materially false and misleading and could have misled a reasonable investor into thinking that the review process with the FTC was progressing better than it was.  It was misleading for Defendant Pessina to express the same high level of confidence about the Merger obtaining regulatory approval based on his inside knowledge of the FTC's review. Among other things:  (i) Rite Aid and Walgreens had already agreed to divest additional stores and again extend the Merger Agreement's End Date from January 27, 2017, until July 31, 2017, in order to obtain regulatory approval from the FTC; (ii) the FTC told Rite Aid and Walgreens that there were certain geographic areas of interest that could suffer anti-competitive effects as a result of the Merger; (iii) Rite Aid and Walgreens were still working with the FTC and attempting to address their concerns regarding the divestiture agreement with Fred's; and (iv) Rite Aid and Walgreens had still not substantially complied with the FTC's Second Request, which had been outstanding for almost a year-and-a-half.  Defendant Pessina's statements were therefore materially false and misleading and, as the Court found in denying Defendants' motion to dismiss in the Class Action "[a]t a time when approval of the transaction may have been legitimately in doubt, the Walgreens

Defendants' statements alluded to secret knowledge that created a false sense of security."

## ADDITIONAL ALLEGATIONS OF SCIENTER

109.   Plaintiff repeats and re-alleges each and every paragraph contained above as if set forth herein.

110.   As the Court has already found in denying Defendants' motions to dismiss in the Class Action, Defendants Pessina and Fairweather acted with scienter with respect to the materially false and misleading statements set forth above because they knew, or at the very least recklessly disregarded, that those statements were false when made.

111.   During the relevant period, Defendant Pessina was Walgreens' Executive Vice Chairman and CEO and Defendant Fairweather was Walgreens' Executive Vice President and Global CFO.  By virtue of their responsibilities and activities in these positions, Defendants Pessina and Fairweather were privy to, and participated in, the fraudulent conduct described herein.  As Walgreens' most senior executives during the relevant time period, Defendants' scienter is imputable to Walgreens.

112.   If the Merger obtained regulatory approval, Walgreens would have increased its number of stores by 55% and overtaken CVS as the largest retail drug store chain in the United States, both in terms of revenue and number of stores.  The

FTC's review of the Merger therefore impacted a critical part of Walgreens' core business.  Because of that, Defendants Pessina and Fairweather would have had robust knowledge of the progress and likely outcome of the FTC's review of the Merger at any point in time.

113.   As the Court has already found in denying Defendants' motions to dismiss in the Class Action, "[g]iven what Defendants knew or should have known [about the merger's "looming failure"] . . . Defendants were at least reckless" in expressing the same high level of confidence about the Merger obtaining regulatory approval and dismissing news articles to the contrary based on their inside knowledge of the FTC's review.

114.   Before making the misrepresentations on October 20, 2016, Defendants knew about, or recklessly disregarded, the progress and likely outcome of the FTC's review of the Merger at that point.  Defendants and Weil had been working with the FTC for nearly a year to address its concerns about the Merger.  The FTC had made several requests for information and documentary material and had "extensive discussions" with Weil regarding "the merits of the transaction, the proposed synergies and potential remedies, including the potential divestiture of retail stores." The FTC had also identified certain geographic areas of interest that could suffer anti-competitive effects as a result of the Merger and would therefore need to be remediated before the Merger could obtain regulatory approval.    Although

Walgreens had begun formulating a divestiture plan and negotiating with potential purchasers for some or all of the divestiture assets, as of October 18, 2016, "[n]o divestiture transaction had been entered into yet, and [Walgreens] believed the parties still needed to make substantial progress with multiple potential buyers in order to determine the best path forward."  Rite Aid and Walgreens were therefore forced to extend the Merger Agreement's End Date from October 27, 2016, until January 27, 2017, "in order to provide additional time to obtain FTC approval and close the transaction."  Rather than provide investors with a truthful update about the progress and likely outcome of the FTC's review, Defendant Pessina – as stated by the Court in denying Defendants' motion to dismiss in the Class Action – "express[ed] unwavering confidence that the merger would pass FTC review under the terms of the Original Merger Agreement.  He disputed skeptical news reports, questioning their sources and implying that Defendants had access to inside information."

115.  Before making the misrepresentations on November 17, 2016, Defendants similarly knew about, or recklessly disregarded, the progress and likely outcome of the FTC's review of the Merger at that point.  Although nearly a month had gone by since Defendants extended the Merger Agreement's End Date, the Merger was no closer to obtaining regulatory approval.  Walgreens was still in negotiations with three potential purchasers, and the FTC had met with each of them

only recently to discuss their "suitability as a potential purchaser of the divestiture assets" and their "plans to transition to a full operation of the divestiture assets from Rite Aid." With just two-and-a-half months until the Merger Agreement's End Date, Walgreens had still not selected a potential purchaser or presented a divestiture agreement to the FTC for its review and approval – necessary prerequisites to obtaining regulatory approval of the Merger. Rather than provide investors with a truthful update about the progress and likely outcome of the FTC's review, Defendant Fairweather – as stated by the Court in denying Defendants' motion to dismiss in the Class Action – "made assurances that the FTC would approve the merger" and "took issue with the way it had been reported in the news." Gradwell similarly told investors that "Defendants knew what they had to do to pass FTC review" based on the "clarity" they had received from the FTC. "Gradwell again implied that Defendants had access to inside information from the FTC when he denied that the agency had any 'blocking rationale.'"

116.  Before making the misrepresentations on January 5, 2017, Defendants knew about, or recklessly disregarded, the progress and likely outcome of the FTC's review of the Merger at that point. Despite there being only a few weeks to go until the Merger Agreement's End Date, Defendants had only recently entered into the divestiture agreement with Fred's and submitted the agreement to the FTC for its review and approval. The FTC was therefore still in the midst of analyzing the

proposed divestiture agreement, requesting "substantial" documents from Rite Aid and Walgreens related to the Merger, and serving subpoenas on members of Fred's management.   Indeed, because it was becoming increasingly unlikely that the Merger would obtain regulatory approval by the January 27, 2017 End Date, Rite Aid began privately discussing its future as a stand-alone company.   Rather than provide investors with a truthful update about the progress and likely outcome of the FTC's review, Defendant Pessina – as stated by the Court in denying Defendants' motion to dismiss in the Class Action – "reiterated that the merger would prevail. He also denied that Walgreens had a 'Plan B' in case the FTC ultimately decided not to approve the merger.   A backup plan was unnecessary, Defendant Pessina maintained, because Walgreens had a 'very good relationship with the people of the FTC.'"  Notwithstanding the fact that Defendant Pessina had just told investors, the day before, that he was confident in the Merger and that there was no "Plan B," Jones Day informed Rite Aid on January 6, 2017,  that, in its opinion "the FTC would not recommend approval of the divestiture transaction by the end date."

117.  Finally, before making the misrepresentations on April 5, 2017, Defendants knew about, or recklessly disregarded, the progress and likely outcome of the FTC's review of the Merger at that point.  On January 29, 2017, Rite Aid and Walgreens amended the Merger Agreement to provide for the divestiture of additional stores and to extend the End Date from January 27, 2017, until July 31,

2017, "in order to allow the parties additional time to obtain regulatory approval." Despite having this additional time, it was still unlikely that the FTC would approve the Merger by the new End Date.   Indeed, as of April 5, 2017, Rite Aid and Walgreens had not yet even substantially complied with the FTC's Second Request, which had been outstanding for almost a year-and-a-half.   Rather than provide investors with a truthful update about the progress and likely outcome of the FTC's review, Defendant Pessina – as stated by the Court in denying Defendants' motion to dismiss in the Class Action – "conveyed a renewed confidence in the merger's success given the revisions that had been made.   When an analyst on the call noted points of apparent disagreement between Defendants and the FTC, Defendant Pessina denied that characterization."

118.   As noted by the Court in denying Defendants' motions to dismiss in the Class Action, the fact that Defendants' misrepresentations "were made in close proximity to both the revision of the merger agreement and the ultimate decision to terminate the merger" provides further evidence of Defendants' scienter.

119.   Additionally, and as also noted by the Court in denying Defendants' motions to dismiss in the Class Action, Defendants' misrepresentations were "made specifically to counteract reports that the merger may not be approved, making them more than mere statements of corporate optimism."   This too, provides further evidence of Defendants' scienter.

120.   In sum, and as stated by the Court in denying Defendants' motions to dismiss in the Class Action, "Defendants repeatedly insisted that the merger would pass regulatory review, while actively contradicting reports to the contrary. Moreover, Defendants continued to hold the line despite having to revise the Original Merger Agreement's terms and adjust the merger's timeline.  Defendants refused to acknowledge that the merger was rapidly becoming less probable." "[O]nce the FTC raised concerns and the original terms of the merger needed to be revised, one would expect the Walgreens Defendants to soften their aggressively confident stance.  Instead, the Walgreens Defendants seemed to double-down and disputed reports that the transaction may falter."  "[I]n the end, the merger was terminated, which was a logical consequence of its downward trajectory."  As the Court found, these allegations "support an inference of fraudulent intent that is at least as compelling as any competing inference."

## PLAINTIFF'S ACTUAL RELIANCE

121.   Mason managed Plaintiff's investment in Rite Aid common stock during the relevant period.  Mason made the investment decisions with respect to Plaintiff's purchases of Rite Aid common stock.  Mason considered Defendants' high level of confidence about the Merger obtaining regulatory approval, dismissal of news articles to the contrary, and inside knowledge of the FTC's review, among other things, in making such investment decisions.

122.   Prior to making the decision to purchase Rite Aid common stock, a Mason investment analyst actually and justifiably read or heard and relied on (to the extent such documents or statements had been published or made at the time) the 2016 10-K Earnings Call, Jefferies Healthcare Conference Presentation, 1Q2017 Earnings Call, and 2Q2017 Earnings Call, including the statements concerning Defendants' high level of confidence about the Merger obtaining regulatory approval, dismissal of news articles to the contrary, and inside knowledge of the FTC's review.

123.   Mason actually and justifiably relied on the information contained or relayed in the 2016 10-K Earnings Call, Jefferies Healthcare Conference Presentation, 1Q2017 Earnings Call, and 2Q2017 Earnings Call (to the extent such documents or statements had been published or made at the time) in making each purchase set forth in Exhibit A on behalf of Plaintiff.

## PRESUMPTION OF RELIANCE

124.   In addition to Plaintiff's actual reliance, Plaintiff intends to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:  (i) Defendants made public misrepresentations during the relevant time period; (ii) the misrepresentations were material; (iii) Rite Aid common stock traded in an efficient market; (iv) as the Court has already found in denying Defendants' motion to dismiss in the Class Action, the misrepresentations

alleged would tend to induce a reasonable investor to misjudge the value of Rite Aid common stock; and (v) Plaintiff purchased Rite Aid common stock between the time Defendants misrepresented material facts and the time when the true facts were disclosed, without knowledge of the misrepresented facts.

125.   The market for Rite Aid common stock was open, well-developed, and efficient at all relevant times.  As a result of the aforementioned materially false and misleading statements, Rite Aid common stock traded at artificially inflated prices during the relevant period.  Indeed, Rite Aid later admitted that its stock price during the relevant period was "not an accurate reflection of the value of Rite Aid because such stock price reflected market expectations of the likelihood that the merger would occur on the terms of the original merger agreement and did not reflect the value of Rite Aid as an independent company."  The artificial inflation did not begin to dissipate until the market began to realize the nature and extent of Defendants' misrepresentations concerning the progress and likely outcome of the FTC's review of the Merger.

126.  At all relevant times, the market for Rite Aid common stock was efficient for the following reasons, among others: (i) Rite Aid filed periodic reports with the SEC; (ii) Rite Aid common stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange; (iii) numerous investment analysts followed Rite Aid; and (iv) Rite Aid regularly communicated

with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

127.   Plaintiff purchased Rite Aid common stock in reliance on the market price of Rite Aid common stock, which reflected all the information in the market, including Defendants' misstatements.

## LOSS CAUSATION

128.   As a series of partial but inadequate disclosures were issued partially correcting the prior false and/or misleading statements concerning the progress and likely outcome of the FTC's review of the Merger, as detailed above in paragraphs 87-88 and 90-91, the price of Rite Aid stock declined precipitously and Plaintiff was damaged.

129.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff.  During the time that Plaintiff purchased Rite Aid common stock, as set forth in Exhibit A, the market price of Rite Aid common stock was artificially inflated as a direct result of Defendants' materially false and misleading statements.

130.   On June 9, 2017, various news outlets, including Bloomberg, Reuters, and the Financial Times reported that the FTC was leaning towards denying the

Merger and preparing to recommend that a lawsuit be filed to block it. Rite Aid's stock dropped *15%* in response to this partial disclosure, from a closing price of $3.53 per share on June 8, 2017, to a closing price of $3.00 per share on June 9, 2020.

131.   On June 29, 2017, Rite Aid and Walgreens each separately announced that they had agreed to terminate the Amended Merger Agreement and had instead entered into the Asset Purchase Agreement. According to Rite Aid's press release, "[t]he decision to terminate the merger agreement follows feedback received from the Federal Trade Commission ('FTC') that led the company to believe that the parties would not have obtained FTC clearance to consummate the merger." The parties further announced the divestiture agreement with Fred's would also be terminated and that Walgreens would pay Rite Aid a $325 million fee in connection with the termination of the Amended Merger Agreement.

132.   Rite Aid's stock plummeted nearly 27% in response to this partial disclosure, from a closing price of $3.93 per share on June 28, 2017, to a closing price of $2.89 per share on June 29, 2017.

133.   The fallout from Rite Aid and Walgreens' termination of the Amended Merger Agreement and execution of the Asset Purchase Agreement continued over the next few days. On July 3, 2017, Forbes published a lengthy article detailing the history of the Merger and what was next for Rite Aid and Walgreens. Various news

outlets, including Chain Drug Review and the Motley Fool, also reported that, contrary to Defendants' assurances on the 3Q2017 Earnings Call, obtaining regulatory approval of the Asset Purchase Agreement was not a sure thing.  Chain Drug Review, for example, stated that the Walgreens-Rite Aid "merger remains a work in progress, with increasing indications that it will not happen."

134.   Rite Aid's stock dropped nearly 9% on this news, from a closing price of $2.95 per share on June 30, 2017, to a closing price of $2.69 per share on July 3, 2017.  Rite Aid's stock continued to fall on July 5, 2017, and July 6, 2017, from this news, from a closing price of $2.69 per share on July 3, 2017, to a closing price of $2.36.  Overall, the continued fallout from Rite Aid and Walgreens' termination of the Amended Merger Agreement and news about the Asset Purchase Agreement potentially not obtaining regulatory approval caused Rite Aid stock to drop *20%* between July 3, 2017, and July 6, 2017.

135.   The above partial corrective disclosures also reflect a materialization of foreseeable risks that Defendants concealed through their materially false and misleading statements.

136.   Defendants sought to reassure investors about the Merger by expressing the same high level of confidence about it obtaining regulatory approval and dismissing news articles to the contrary based on their inside knowledge of the FTC's review.   In making these representations, Defendants concealed the

foreseeable risk that the FTC would not in fact approve the Merger by the July 31, 2017 End Date.  As investors began to learn the truth regarding the progress and likely outcome of the FTC's review of the Merger, that foreseeable risk gradually materialized, causing Rite Aid's stock price to decline as detailed above.

137.   Indeed, as the Court found in denying Defendants' motion to dismiss in the Class Action, "Defendants refused to acknowledge that the merger was rapidly becoming less probable.  And in the end, the merger was terminated, which was a logical consequence of its downward trajectory."

## NO SAFE HARBOR

138.   As the Court has already found in denying Defendants' motion to dismiss in the Class Action, the statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements pleaded in this Complaint.  The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made.  Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected."  To the extent that any of the statements pleaded herein were forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements.  Alternatively, to the extent

that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are nevertheless liable for those materially false and misleading statements because at the time each of the forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer at Walgreens who knew that the particular forward-looking statement was false when made.

## FIRST CAUSE OF ACTION

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

139.  Plaintiff repeats and re-alleges each and every paragraph contained above as if fully set forth herein.

140.  This cause of action is brought against Defendants Walgreens, Pessina, and Fairweather for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

141.  Defendants Walgreens, Pessina, and Fairweather both directly and indirectly used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements alleged herein to:  (i) deceive the investing public, including Plaintiff, as alleged herein; (ii) artificially inflate and maintain the market price of Rite Aid common stock; and (iii) cause Plaintiff to purchase Rite Aid common stock at artificially inflated prices.  In

furtherance of this unlawful scheme, plan, and course of conduct, Defendants Walgreens, Pessina, and Fairweather took the actions set forth above.

142.   Defendants Walgreens, Pessina, and Fairweather both directly and indirectly:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit on the purchasers of Rite Aid common stock in an effort to artificially inflate and maintain the market prices for Rite Aid common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

143.   By virtue of their high-level positions at Walgreens, Defendants Pessina and Fairweather were authorized to make public statements, and made public statements, on Walgreens' behalf.  These senior executives were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of Walgreens' and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

144.   Defendants Walgreens, Pessina, and Fairweather acted with knowledge or reckless disregard for the truth of the misrepresented facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them.  Defendants Walgreens', Pessina's, and Fairweather's material misrepresentations were done knowingly and/or recklessly, and had the

effect of concealing the truth with respect to the progress and likely outcome of the FTC's review of the Merger from the investing public.  By concealing these material facts from investors, Defendants Walgreens, Pessina, and Fairweather supported the artificially inflated price of Rite Aid common stock.

145.   The dissemination of the materially false and misleading information, as set forth above, artificially inflated the market price of Rite Aid common stock. In ignorance of the fact that the market prices were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Defendants, and upon the integrity of the market in which Rite Aid's common stock trades, or upon the absence of material adverse information that was recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiff purchased Rite Aid common stock at artificially inflated prices.  As a series of partial but inadequate disclosures were issued, the price of Rite Aid common stock substantially declined.

146.   At the time of the material misrepresentations alleged herein, Plaintiff was ignorant of their falsity, and believed them to be true.  Had Plaintiff known the truth with respect to the progress and likely outcome of the FTC's review of the Merger, which was concealed by Defendants, Plaintiff would not have purchased Rite Aid common stock, or if it had purchased such common stock, it would not have done so at the artificially inflated prices that it paid.

147.   By virtue of the foregoing, Defendants Walgreens, Pessina, and Fairweather violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

148.   As a direct and proximate result of Defendants Walgreens', Pessina's, and Fairweather's wrongful conduct, Plaintiff has suffered damages in connection with its transactions in Rite Aid's common stock.

149.   Taking into account, *inter alia*, the tolling of the limitations period by the filing of the class action complaints against Defendants in the Class Action, Plaintiff has brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## SECOND CAUSE OF ACTION

### Violations of Section 20(a) of the Exchange Act
### Against Defendants Pessina and Fairweather

150.   Plaintiff repeats and re-alleges each and every paragraph contained above as if set forth fully herein.

151.   This cause of action is asserted against Defendants Pessina and Fairweather and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

152.   Each of Defendants Pessina and Fairweather was a controlling person of Walgreens within the meaning of Section 20(a) of the Exchange Act.

153.   By virtue of their high level positions, and their ownership and contractual rights, substantial participation in, and/or awareness of, the FTC's review of the Merger and/or knowledge or reckless disregard of the materially false and misleading statements disseminated to the investing public, Defendants Pessina and Fairweather had the power to influence and control, and did in fact influence and control, directly or indirectly, the decision-making of Walgreens.

154.   Defendants Pessina and Fairweather were provided with or had unlimited access to copies of Walgreens' press releases, scripts, and other statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.   In particular, Defendants Pessina and Fairweather each had direct and supervisory involvement in the day-to-day operations of Walgreens, and therefore are presumed to have had the power to control or influence the particular false and misleading statements giving rise to the securities violations alleged herein.

155.   Defendants Pessina and Fairweather culpably participated in Walgreens' violation of Section 10(b) and Rule 10b-5 with respect to the First Cause of Action.

156.   By reason of the conduct alleged in the First Cause of Action, Walgreens is liable for violations of Section 10(b) of the Exchange Act and Rule

10b-5 promulgated thereunder, and Defendants Pessina and Fairweather are liable pursuant to Section 20(a) based on their control of Walgreens.

157.   Defendants Pessina and Fairweather are liable for the aforesaid wrongful conduct, and are liable to Plaintiff for the substantial damages suffered in connection with its purchases of Rite Aid common stock.

158.   Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaints against Defendants in the Class Action, Plaintiff has brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests relief and judgment, as follows:

a.   Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

b.   Awarding Plaintiff its attorneys' fees and costs; and

c.   Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury as to all issues so triable.

Dated:  December 8, 2020

Respectfully submitted,

KLEHR HARRISON
HARVEY BRANZBURG LLP

By:  /s/ William J. Clements

William J. Clements
(Pa. I.D. No. 86348)
1835 Market Street, 14th Floor
Philadelphia, PA 19103
Ph    (215) 569-2700
Fax  (215)  568-6603
wclements@klehr.com
*Local Counsel for Plaintiff*[2]

Of Counsel:

Lawrence M. Rolnick (*pro hac vice* motion to be filed)
Marc B. Kramer (*pro hac vice* motion to be filed)
Michael J. Hampson (*pro hac vice* motion to be filed)
Nicole T. Castiglione (*pro hac vice* motion to be filed)
ROLNICK KRAMER SADIGHI LLP
1251 Avenue of the Americas
New York, NY  10020
Tel. 212.597.2800
*lrolnick@rksllp.com*
*mkramer@rksllp.com*
*mhampson@rksllp.com*
*ncastiglione@rksllp.com*

---

[2] Michael K. Coran and Glenn A. Weiner, Esquires, of this firm will also be entering their appearance as counsel for Plaintiff once they are admitted to this Court.